**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LUCAS OBI, | : | |
| Petitioner | : | No. 1:12-cr-00311 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| Respondent | : | |

**MEMORANDUM**

Before the Court is Petitioner Lucas Obi ("Petitioner")'s amended motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Doc. No. 150.) In his amended motion, Petitioner alleges six (6) grounds for relief under the banner of ineffective assistance of counsel.[1] (Id.) For the reasons that follow, the Court will deny Petitioner's motion.

## I.    BACKGROUND

On December 12, 2012, a grand jury returned a twenty-five (25) count indictment against Petitioner and two alleged co-conspirators for violations including: (1) wire fraud (18 U.S.C. § 1343); (2) money laundering (18 U.S.C. § 1956); and (3) conspiracy to commit mail fraud, wire fraud, and money laundering (18 U.S.C. § 371). (Doc. No. 1.) The indictment alleged that between 1999 and 2010, Petitioner was complicit in a number of fraudulent mass-marketing schemes, the proceeds of which he and his co-conspirators laundered through Western Union and MoneyGram. (Id. at 2.) Western Union and MoneyGram identified 2,971 fraud-induced transfers attributable to the co-conspirators between 2005 and 2010, totaling $4,466,860.00. (Id.

---

[1] In the introductory paragraph of Petitioner's Amended Motion to Vacate, he lists five (5) specific grounds on which he asserts he was provided ineffective assistance of counsel during the plea process. (Doc. No. 150 at 3-4.) However, the body of the motion organizes these five (5) claims under two (2) broader grounds. For the purposes of clarity, the Court will consider Petitioner to be asserting the grounds he details on the first page of the Amended Motion, which the Court divides into six (6) separate grounds, and will address each ground accordingly.

¶ 21.)  The Government alleged that the total value of the fraudulent transfers processed by Petitioner and his co-defendants is "conservatively estimated" to exceed 10 million dollars.  (Id.)

On August 25, 2016, Petitioner entered a plea of not guilty as to all counts.  (Doc. No. 18.)  However, on March 31, 2017, Petitioner accepted a plea agreement ("Plea Agreement") offered by the Government and pleaded guilty to one count of wire fraud (18 U.S.C. § 1343). (Doc. No. 40.)  The Plea Agreement specified that the maximum penalty for the offense was twenty (20) years imprisonment, a fine of $250,000, and three (3) years of supervised release. (Id. § A ¶ 1.)  On the issue of restitution, the Plea Agreement states that the victims of Petitioner's offense are entitled to "full and timely restitution as provided for by law" and that "the court is authorized to order restitution by the defendant including, but not limited to, restitution for property loss, economic loss, personal injury, or death."  (Id. § G ¶ 14(f).)  There is no recommended or anticipated restitution amount listed.  (Id.)  The Plea Agreement also contains an appellate waiver.  (Id. § L ¶ 29.)  In exchange for Petitioner's guilty plea, the Government recommended a three-level reduction in Petitioner's sentence based on acceptance of responsibility.  (Id. § C ¶ 10.)

On August 15, 2018, the United States Probation Office for the Middle District of Pennsylvania issued the Final Presentence Investigation Report ("PSR").  (Doc. No. 75.)  The PSR recommended a restitution amount of $2,393,906.34 based on the underlying losses of Petitioner's 2,641 victims, which totaled $4,482,927.  (Id. ¶¶ 17,18,100.)  The PSR also noted that Petitioner had a prior history of fraud-based crimes, which resulted in two convictions in the mid-1990s.  (Id. ¶¶ 60-63.)  Petitioner objected to several aspects of the PSR, including: (1) the total loss amount and the associated offense level increase; (2) the finding that Petitioner was a

"leader, manager, or supervisor" and the associated offense level increase; and (3) the criminal history points calculation. (Doc. No. 76.)

On October 22, 2018, the day before sentencing, Petitioner submitted a sentencing memorandum, in which the parties stipulated that: (1) Petitioner would withdraw his objection to the loss amount; (2) the two-level leadership enhancement did not apply; and (3) Petitioner was a check casher, and therefore would likely have received a smaller cut of the proceeds than an agent. (Doc. No. 80 at 3.) In Petitioner's memorandum, he argued that the Court should grant a downward deviation from the loss amount guidelines given that the calculated loss amount "greatly exceeded his personal gain." (Id.) In addition, Petitioner argued that he should receive a shorter term of imprisonment so that he would be better able to work and provide restitution to his victims. (Id. at 25.)

On October 23, 2018, the Court sentenced Petitioner to one hundred forty-four (144) months imprisonment, followed by three (3) years supervised release, and ordered him to pay $2,393,906.34 in restitution. (Doc. No. 82.) On October 30, 2018, Petitioner filed a pro se appeal of the judgment and sentence. (Doc. No. 85.) Attorney Elisabeth Pasqualini, Petitioner's Plea Counsel ("Plea Counsel"), filed a motion with the Third Circuit Court of Appeals to withdraw her representation, citing the appellate waiver in the Plea Agreement. See United States v. Obi, No. 18-3426 (3d Cir. filed Oct. 29, 2018), ECF No. 003113230240. In response, Petitioner filed a pro se brief consenting to the withdrawal of Plea Counsel and requesting that the appeals court appoint a CJA panel attorney to represent him on appeal. See id., ECF Doc. No. 003113329037. On September 16, 2019, the Third Circuit Court of Appeals simultaneously granted Plea Counsel's request to withdraw and terminated Petitioner's appeal. (Doc. No. 89.)

On October 28, 2019, Petitioner filed his original motion to vacate, requesting an evidentiary hearing.  (Doc. No. 90.)  On October 31, 2019, Petitioner was sent a Miller/Mason order and notice of election.  (Doc. No. 91.)  Petitioner returned the notice of election indicating that he wanted the Court to rule on his motion to vacate as filed.  (Doc. No. 92.)  The Court subsequently issued a service and briefing order directing the Government to respond to the motion.  (Doc. No. 93.)  On December 16, 2019, the Government filed its brief in opposition to Petitioner's motion.  (Doc. No. 94.)

The Court granted a hearing on Petitioner's motion and assigned Petitioner counsel. (Doc. No. 96.)  Petitioner has been represented by several different attorneys, both private and court-appointed, in connection with his habeas petition.  (Doc. Nos. 97, 110, 126, 135, 139, 140.) On February 12, 2021, after numerous extensions were granted by the Court, Petitioner filed his counseled, amended motion to vacate.  (Doc. Nos. 99, 108, 131, 134, 137, 146, 150 at 3.)  On September 8, 2021, the Government filed a brief in opposition to Plaintiff's amended motion. (Doc. No. 165.)

The Court held an evidentiary hearing on Petitioner's motion on December 9, 2021. (Doc. No. 173.)  At the hearing, Petitioner testified in support of his ineffective assistance of counsel claims and Plea Counsel testified in support of the Government's opposition to Petitioner's motion.  (Id.)  Attorney Heidi Eakin ("Eakin") also testified on behalf of Petitioner. (Id.)  Although Eakin never formally represented Petitioner, she was contacted by Petitioner's family when they purportedly became concerned about Plea Counsel's lack of communication

with Petitioner as to his case.  (Id. at 36-37.)  Eakin testified that she met with Petitioner in prison on one occasion and later attended his sentencing. [2]  (Id. at 51-52, 56.)

At the request of Petitioner, the Court issued an order granting the parties leave to submit supplemental briefing following the evidentiary hearing.  (Doc. No. 174.)  Following the Court's Order, Petitioner filed a supplemental brief (Doc. No. 175), and the Government filed a brief in opposition (Doc. No. 176).  Having been fully briefed, Petitioner's amended motion to vacate is now ripe for disposition.  (Doc. No. 150.)

## II.   LEGAL STANDARD

Under 28 U.S.C. § 2255(a), a federal prisoner may file a motion requesting that the sentencing court vacate, set aside, or correct his sentence on the basis "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the [C]ourt was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  See 28 U.S.C. § 2255(a).  However, "§ 2255 does not afford a remedy for all errors that may have been made at trial or during sentencing."  See United States v. Essig, 10 F.3d 968, 977 n.25 (3d Cir. 1993) (citing United States v. Addonizio, 442 U.S. 178, 185 (1979)).  Rather, § 2255 is implicated only when the alleged error raises "a fundamental defect which inherently results in a complete miscarriage

---

[2] The Court gives little weight to Eakin's testimony, as she was unable to identify when many of the events she recounted took place.  (Doc. No. 173 at 37-38.)  For instance, she was unable to tell the Court if her meeting with Petitioner at Perry County Prison took place before or after his plea was entered.  (Id. at 38.)  While the Petitioner submitted prison visitor logs from April 28, 2018 through October 31, 2018 as exhibits to his supplemental brief in support, none of those records include Eakin's visit.  (Doc. No. 175-2.)  While the Court does not question the credibility of Eakin's testimony, given the unclear timeline, Eakin's testimony sheds minimal light on whether Petitioner understood the contents of the Plea Agreement at the time he pleaded guilty.  Therefore, the Court will reference Eakin's testimony sparingly in this Memorandum.

of justice." See Addonizio, 442 U.S. at 185.  A petitioner has one year from the time his conviction becomes final to file a § 2255 motion.  See 28 U.S.C. § 2255(f)(1).

To establish entitlement to relief, a collateral attack of a sentence based upon a claim of ineffective assistance of counsel must meet a two-part test established by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  See George v. Sively, 254 F.3d 438, 443 (3d Cir. 2001).  When a plea agreement is the result of ineffective assistance of counsel, it was not "voluntary and intelligent," and it is therefore invalid.  See Hill v. Lockhart, 474 U.S. 52, 56-57 (1985).

The first Strickland prong requires Petitioner to "establish first that counsel's performance was deficient."  See Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001).  This prong requires Petitioner to show that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment.  See id.  To that end, Petitioner must demonstrate that counsel's representation fell below an "objective standard of reasonableness" under prevailing professional norms.  See id. (quoting Strickland, 466 U.S. at 688).  However, "[t]here is a 'strong presumption' that counsel's performance was reasonable."  See id.

Under the second Strickland prong, Petitioner "must demonstrate that he was prejudiced by counsel's errors."  See id.  This prong requires Petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  See id. (quoting Strickland, 466 U.S. at 694).  Reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome."  See id. (quoting Strickland, 466 U.S. at 694).  Stated differently, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  See Strickland, 466 U.S. at 691.  Therefore, a defendant is not

deprived of their Sixth Amendment rights when their attorney fails to raise an argument that is without merit.  See United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999).

In the context of a guilty plea, the second prong of the Strickland test is modified: "In order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  See Hill, 474 U.S. at 59.  Moreover, the petitioner must show that the decision to go to trial would have been "rational under the circumstances."  See Padilla v. Kentucky, 559 U.S. 356, 371-72 (2010).  "Counsel is required to give a defendant information sufficient 'to make a reasonably informed decision whether to accept a plea offer.'"  Shotts v. Wetzel, 724 F.3d 364, 367 (3d Cir. 2013) (quoting United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992)).  However, errors by plea counsel generally do not amount to constitutionally ineffective assistance where an adequate plea colloquy was conducted, and the substance of the plea colloquy corrected any erroneous advice given by counsel.  See United States v. Mayhew, 995 F.3d 171, 179-80 (4th Cir. 2021); United States v. Molina-Marrero, 320 F.3d 64, 68 (1st Cir. 2003).  Additionally, when a defendant chooses to plead guilty and waives his right to a trial, he accepts the risk that his attorney "will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts."  See McMann v. Richardson, 397 U.S. 759, 770 (1970).  Likewise, counsel's "erroneous strategic prediction about the outcome of trial is not necessarily deficient performance."  See Lafler v. Cooper, 566 U.S. 156, 174 (2012).

III.   **DISCUSSION**

A.   **Status of Petitioner's Original Motion to Vacate**

Petitioner's uncounseled motion to vacate contains a number of grounds for relief that were not fully reiterated in the amended motion or addressed in Petitioner's briefs thereafter.

(Doc. No. 90.)  Those grounds include: (1) Petitioner is actually innocent of the crime to which

he pleaded guilty; (2) Plea Counsel failed to advise Petitioner that he could not be found guilty of

wire fraud, as he was not located within the jurisdiction of the United States; (3) the Court was

without jurisdiction to hear Petitioner's criminal case; (4) Plea Counsel threatened to withdraw

her representation of Petitioner if he did not plead guilty; (5) Plea Counsel failed to explain that

by pleading guilty Petitioner waived his right to direct appeal; (6) Plea Counsel failed to object to

the Government's inaccurate criminal history calculation; and (7) Plea Counsel failed to

represent Petitioner in his direct appeal.  (Id.)  Petitioner's amended § 2255 motion briefly

summarizes the original motion, but omits any in-depth discussion of the grounds listed above.

(Doc. No. 150 at 7-11.)  Moreover, Petitioner's counsel did not question witnesses at the

evidentiary hearing as to these grounds nor were they addressed in Petitioner's post-hearing

supplemental brief.  (Doc. Nos. 173, 175.)

  The right to amend a § 2255 petition stems from Federal Rule of Civil Procedure Rule

15.  See 28 U.S.C. § 2242 (establishing that Habeas petitions and motions "may be amended or

supplemented as provided in the rules of procedure applicable to civil actions").  When a

pleading is amended under Rule 15, the new pleading ordinarily supersedes the original

pleading, "unless the amended complaint specifically refers to or adopts the earlier pleading."

See W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank, 712 F.3d 165, 171 (3d Cir.

2013) (internal quotation marks omitted).  When a party intends its amended pleading to adopt

the allegations of an earlier pleading, "references to prior allegations must be direct and explicit

in order to enable the responding party to ascertain the nature and extent of the incorporation."

See 5 Wright & Miller, Fed. Prac. & Proc. § 1326.  Because Petitioner did not explicitly

incorporate the original motion into his amended motion or otherwise indicate that he intended to

pursue the above-listed grounds, the Court considers Petitioner's amended motion to supersede his original motion. (Doc. Nos. 90, 150.) Therefore, the Court shall consider only allegations and grounds for relief asserted in the amended motion. (Doc. No. 150.)

### B.    Procedural Default

The Government argues that the claims raised in Petitioner's motion have been procedurally defaulted by his failure to raise them earlier in the proceedings. (Doc. No. 165 at 4-6.) This is not so, however, as the Supreme Court established definitively in Massaro v. United States 538 U.S. 500 (2003) that ineffective assistance of counsel claims are not defaulted by failure to raise them on direct appeal, no matter the circumstances. See Id. at 504 (holding that "requiring a criminal defendant to bring ineffective-assistance-of-counsel claims on direct appeal does not promote" the objectives of finality or judicial efficiency). Rather, "ineffective-assistance claims ordinarily will be litigated in the first instance in the district court, the forum best suited to developing the facts necessary to determining the adequacy of representation." See id. at 505. The Government has given the Court no reason why this case should constitute an exception to the Massaro rule. The Court holds that Petitioner's claims are not procedurally defaulted and therefore it must consider the substance of his ineffective assistance claims.

### C.    Ineffective Assistance of Counsel

As noted, supra, Petitioner asserts ineffective assistance of counsel based on six (6) individual grounds, which the Court addresses below.

### 1.    Plea Counsel Misinformed Petitioner as to the Elements of Wire Fraud

In Petitioner's amended motion, he claims that he told Plea Counsel that he had no personal knowledge of the fraudulent nature of the transactions he facilitated and had no intent to harm. (Doc. No. 150 at 14-16.) Plea Counsel allegedly responded that Petitioner could be

convicted without proof of his knowledge and intent.  (Id.)  Such an assertion would have been

contrary to the law.  See 18 U.S.C. § 1343; United States v. Andrews, 681 F.3d 509, 518 (3d Cir.

2012) (referencing "specific intent to defraud" as one of the three elements of wire fraud).

Petitioner claims Plea Counsel's representation led him to accept the Government's plea

agreement, and that he would have otherwise chosen to go to trial.  (Doc. No. 150 at 14-16, 18.)

At the evidentiary hearing, Petitioner reiterated the claim made in his motion to vacate that Plea

Counsel never discussed with him the elements of the offenses with which he was charged or

what the Government would have to prove for him to be convicted.  (Doc. No. 173 at 16.)

Petitioner testified that, at their first meeting, he told Plea Counsel "I didn't do this. I'm only a

check cashing man. I didn't talk to anybody. I don't know anything about this."  (Doc. No. 173 at

9.)  Petitioner also argues that the defects in Plea Counsel's initial advice were not cured by the

plea colloquy.  (Doc. Nos. 150 at 18, 175 at 1.)

    In her testimony, Plea Counsel contradicted Petitioner, testifying that her normal practice

would be to go over the specific offenses charged as well as their elements with her clients, and

that she did so with Petitioner.  (Doc. No. 173 at 66-67.)  Additionally, Plea Counsel testified

that while Petitioner initially maintained that he had no knowledge that many of the transfers he

was processing were fraudulent, he later admitted to her that he knew that some of the money

was acquired illegally.  (Id. at 102.)

    Magistrate Judge Carlson conducted an extensive colloquy at the change of plea hearing,

during which Petitioner: (1) acknowledged that he had read the Plea Agreement and that he was

pleading guilty because he was, in fact, guilty; (2) affirmed his understanding that, if he went to

trial, the Government would be required to prove each and every element of the offense charged

against him; (3) indicated that he had addressed all of his questions regarding the Plea

Agreement with Plea Counsel and had enough time to do so; and (4) stated that he had signed the Plea Agreement after having carefully reviewed it with Plea Counsel.[3]  (Doc. No. 87 at 5-15.)

During the change of plea hearing, the Government outlined the extensive evidence it would have presented against Petitioner at trial.  (Id. at 16-22.)  This evidence included testimony that Petitioner was the leader of a wide-ranging network of fraudsters, whom he mentored in how to commit fraud and transfer illegally gained funds.  (Id. at 20-21.)  Following the Government's presentation of its evidence against Petitioner, Magistrate Judge Carlson again asked Petitioner if he was pleading guilty because he was "in fact guilty" of Count II of the indictment.  (Id. at 23.)  Petitioner stated that he was and then said, "I'm guilty."  (Id.)

Upon review of the record before the Court, the arguments presented, and the applicable law, the Court finds that Petitioner's ineffective assistance of counsel claim on this ground lacks merit.  While the testimonies of Plea Counsel and Petitioner directly conflict, the Court need not make a credibility determination, as the plea colloquy was sufficient to ensure that Petitioner understood the elements of the charge to which he was pleading guilty.  See Mayhew, 995 F.3d at 179-80; United States v. Shedrick, 493 F.3d 292, 299 (3d Cir. 2007); Molina-Marrero, 320 F.3d at 68.  Where the elements of the crime a petitioner pleaded guilty to were obvious from the content of the plea hearing, and the petitioner did not express confusion or uncertainty as to the nature of his plea, courts typically find that no collateral relief is warranted.  See Aziz v. Litscher, 27 F. App'x 611, 613 (7th Cir. 2001) (finding no collateral relief warranted where the trial court explained the elements of the charge, the petitioner acknowledged he understood, and

---

[3] Magistrate Judge Carlson was not required to review the specific elements of wire fraud with Petitioner during the plea colloquy.  See Bradshaw v. Stumpf, 545 U.S. 175, 183 (2005) (noting that the Supreme Court has "never held that the judge must himself explain the elements of each charge to the defendant on the record").

then admitted his guilt); <u>Tineo v. United States</u>, 977 F. Supp. 245, 256 (S.D.N.Y. 1996) (finding no collateral relief warranted where the petitioner expressed no uncertainty as to the charges against him, and "never asked for clarification and affirmed that counsel had answered his questions").

In the instant case, the Government's recitation of its evidence during the plea hearing made clear that much of the evidence against Petitioner concerned his direct knowledge of the fraud he facilitated.  (Doc. No. 87 at 20-22.)  Rather than object to the assertions by the Government that Petitioner knowingly facilitated fraud, Petitioner said, under oath, that he was guilty of taking those specific actions.  (Id. at 23.)  Petitioner also stated that he did not have any questions for the Court, that Plea Counsel had answered all of his questions about the Plea Agreement, and that he was satisfied with the representation he received from Plea Counsel.  (Id. at 5, 7, 15.)  Upon review of the first ground of Petitioner's § 2255 motion, the Court finds that Plea Counsel was not constitutionally ineffective, because any deficiency in Plea Counsel's advice as to the elements of wire fraud under 18 U.S.C. § 1343 was cured by the plea colloquy.

## 2.    Plea Counsel Failed to Inform Petitioner of his Potential Restitution Amount

In his amended motion, Petitioner argues that Plea Counsel did not explain to him that he might be liable for restitution beyond the loss amount underlying the one count to which he was pleading guilty and that "nothing in the plea colloquy would have put Petitioner on notice that he was facing a restitution amount in the millions of dollars."  (Doc. No. 150 at 7.)  Petitioner testified at the evidentiary hearing that Plea Counsel did not discuss with him how the underlying loss amount would impact his sentence, including the amount of restitution he would owe, during any of their meetings prior to his signing the Plea Agreement.  (Doc. No. 173 at 9, 12, 18.)  According to Petitioner, he believed that he would only be liable for $240,018, based on the

information in the indictment.  (Id. at 21-22.)  At the evidentiary hearing, Petitioner testified that

if he had known the amount for which he could be held liable, he would not have accepted the

Plea Agreement.  (Id. at 24.)  Similarly, Attorney Eakin testified that when she went to speak

with Petitioner at Perry County Prison, at an unspecified point prior to sentencing, he did not

seem to understand the size of the underlying loss amount or the concept that he could be jointly

and severally liable for the overall loss amount as a co-conspirator.  (Id. at 37-39.)

      Section 2255 provides that a prisoner "in custody under a sentence of a court established

by Act of Congress" may file a § 2255 motion on the basis "that the sentence was imposed in

violation of the Constitution or laws of the United States, or that the [C]ourt was without

jurisdiction to impose such sentence, or that the sentence was in excess of the maximum

authorized by law, or is otherwise subject to collateral attack."  See 28 U.S.C. § 2255(a).  The

United States Court of Appeals for the Third Circuit has concluded, however, "that the monetary

component of a sentence is not capable of satisfying the 'in custody' requirement of federal

habeas statutes."  See United States v. Ross, 801 F.3d 374, 380 (3d Cir. 2015) (collecting cases);

Obado v. New Jersey, 328 F.3d 716, 718 (3d Cir. 2003) (noting that "[t]he payment of restitution

or a fine, absent more, is not the sort of 'significant restraint on liberty' contemplated in the

'custody' requirement of the federal habeas corpus statutes").  Accordingly, "a restitution order

cannot be challenged in a § 2255 motion, either directly or indirectly through a claim of

ineffective assistance of counsel."  See United States v. Tonagbanua, 706 F. App'x 744, 746 (3d

Cir. 2017) (not precedential).  Therefore, insofar as Petitioner challenges the restitution element

of his sentence, such a challenge is not cognizable under § 2255.  See Ross, 801 F.3d at 380.

Because this ground deals solely with Petitioner's objection to the amount of restitution to which

he has been sentenced, the Court finds that it does not present a valid claim for relief.  To the

extent that any of the other grounds asserted by Plaintiff take issue with the restitution amount, the Court will also decline to address the issue.

        **3.**    **Plea Counsel Failed to Inform Petitioner of his Sentencing Exposure, Including the Impact of Dismissed Counts on the Underlying Loss Amount[4]**

As discussed, <u>supra</u>, Petitioner claims that Plea Counsel did not inform him that his sentence would be impacted by the total loss amount from all the counts with which he was originally charged, not just the loss amount for the count to which he pleaded guilty.  (Doc. Nos. 150 at 14-16, 175 at 2.)  Petitioner claims that Plea Counsel predicted that, based on the loss amount underlying Count II, he would likely be sentenced to time served.  (Doc. No. 150 at 16.)  Petitioner testified at the evidentiary hearing that Plea Counsel did not discuss with him how the underlying loss amount would impact his sentence during any of their meetings prior to his signing the Plea Agreement.  (Doc. No. 173 at 9, 12, 18.)  In contrast, Plea Counsel testified that she did not guarantee Petitioner a time-served sentence and that she clarified to Petitioner that his sentence was ultimately at the Court's discretion.  (<u>Id.</u> at 72-73.)  She asserted that prior to Petitioner accepting the Government's plea offer, she explained to him that the overall loss amount was to be determined by the Court and would be calculated based on the overall financial loss to victims.  (<u>Id.</u> at 74-75.)  Plea Counsel also testified that she went through each paragraph of the Plea Agreement with Petitioner and explained its terms.  (<u>Id.</u>)

Plea Counsel testified as to her representation to Petitioner regarding the loss amount as follows:

---

[4] In Petitioner's amended motion and supplemental brief, he also asserts that Plea Counsel did not inform him of the impact of the dismissed counts on his overall sentencing exposure.  (Doc. Nos. 150 at 14-16, 175 at 4-5.)  To the extent that this argument goes to the impact that the overall loss amount had on the restitution element of Petitioner's sentence, the Court will not address it.

Q. That amount there, he indicates here that he thought that -- his impression, he actually says, was that he would be held accountable for roughly $240,000. Is that right?

A. That's correct.

Q. And that jibes pretty much with what you thought the loss amount or you hoped the loss amount would shake out to, which was $250,000. Is that right?

A. That's certainly what I hoped it would be, for sure.

Q. Okay. And you would have advised him that the loss amount would have been about $250,000. Is that right?

A. I would have advised him that we hope that it would be 250,000, but the fact that the court was the one who was going to determine what the loss amount was, I wouldn't have locked either Mr. Obi, nor myself, into that amount. But I certainly would have said, hey, this is what I'm going to argue for and this is what we hope that it comes back to.

(Id. at 84-85.)  In addition to Plea Counsel's testimony that she accurately communicated to Petitioner his potential sentencing exposure, the Plea Agreement, which Petitioner reviewed and signed, contains no mention of a time-served sentence.  (Doc. No. 40.)  The Plea Agreement does lay out Petitioner's maximum sentencing exposure: a term of imprisonment of twenty (20) years, a fine of $250,000, and a term of supervised release of three (3) years, in addition to restitution.  (Id. § A ¶ 1, § I ¶ 22.)  Additionally, the Plea Agreement states that the overall loss amount has not been set and will be determined by the Court "prior to sentencing."  (Id. § G ¶ 16.)

During the plea colloquy, Magistrate Judge Carlson addressed with Petitioner the fact that his sentence was ultimately at the discretion of the sentencing judge:

Q. And do you understand the plea agreement talks about certain recommendations that the government may make, but those recommendations are not binding on Judge Kane. She'll make independent findings and you will not be allowed to withdraw a guilty plea simply because she did not follow any recommendation of the parties. Do you understand that?

A. Yes, Your Honor.

(Doc. No. 87 at 10.)  Additionally, Magistrate Judge Carlson recited the maximum penalties

available for Petitioner's offense and asked Petitioner whether he had been made aware of the

sentencing guidelines by his attorney:

> Q. Do you understand that there are sentencing guidelines that this court must
> consider and may follow when it comes time to sentencing you?
>
> A. Yes, Your Honor.
>
> Q. And have you and Ms. Pasqualini discussed those sentencing guidelines?
>
> MS. PASQUALINI: We have, Your Honor.
>
> A. Yes, Your Honor.
>
> Q. An understand this, Mr. Obi, I would fully expect that Ms. Pasqualini, before
> she would let you sign a plea agreement that talks about guidelines would chat with
> you about how those guidelines work. Did she do that for you?
>
> A. Yes, Your Honor.

(Id. at 11-12.)  Following this exchange, Magistrate Judge Carlson again confirmed that

Petitioner understood that sentencing estimates provided for him by his attorney would not be

binding on Judge Kane.  (Id. at 12.)

It is well established that, when a defendant accepts a plea bargain, he or she also accepts

the risk that counsel "will turn out to be mistaken either as to the facts or as to what a court's

judgment might be on given facts."  See McMann, 397 U.S. at 770.  The Court credits Plea

Counsel's testimony that while she expressed optimism that the Court would give Plaintiff a

time-served sentence, she did not promise Petitioner such a sentence.  (Doc. No. 173 at 72-73.)

Even if Plea Counsel had unequivocally promised Petitioner a time-served sentence, as he asserts

she did, such a misrepresentation would have been cured by the plea colloquy and the Plea

Agreement itself.  See Mayhew, 995 F.3d at 179-80; Shedrick, 493 F.3d at 299-300 (finding that

"where the written plea agreement and in-court guilty plea colloquy clearly establish the defendant's maximum potential exposure and the sentencing court's discretion," it was "inconceivable" that the defendant did not know that he faced the potential of a statutory maximum prison term). Therefore, upon review of the third ground of Petitioner's § 2255 motion, the Court finds that Plea Counsel was not ineffective, because any deficiency in Plea Counsel's advice as to Petitioner's sentencing exposure was cured by the plea colloquy.

### 4.   Plea Counsel Failed to Inform Petitioner of the Risks and Benefits of Proceeding to Trial

Petitioner also contends, somewhat vaguely, that Plea Counsel "did not discuss any possible defenses or help him weigh the costs and benefits of going to trial versus pleading guilty." (Doc. No. 150 at 14.) However, Plea Counsel testified at the evidentiary hearing that she did discuss with Petitioner the possible outcomes of pleading guilty versus going to trial. (Doc. No. 173 at 68-70.) According to Plea Counsel, during her discussions with Petitioner, she explained his potential liabilities and how a jury might view the evidence against him. (Id.) She also emphasized to Petitioner that whether or not to go to trial was his choice to make. (Id. at 70.)

As discussed, supra, during the plea colloquy, Magistrate Judge Carlson told Petitioner that any sentencing recommendations provided by the prosecution or sentencing predictions offered by defense counsel would not be binding on Judge Kane. (Doc. No. 87 at 12-14.) Magistrate Judge Carlson also ensured that Petitioner understood that by pleading guilty he was giving up his right to a jury trial and its attendant procedural protections, including: the presumption of innocence; the standard of proof beyond a reasonable doubt; the requirement of a unanimous jury verdict for conviction; and the right to file pretrial motions and subpoena witnesses. (Id. at 5-6.)

17

Given the testimony of Plea Counsel and the Court's review of the plea colloquy transcript, the Court finds that Plea Counsel was not ineffective on this ground.  The Court credits Plea Counsel's testimony that she advised Petitioner about the strategic costs and benefits of going to trial.  (Doc. No. 173 at 68-71.)  However, even if Plea Counsel had failed to advise Petitioner about his right to a jury trial and the potential advantages of exercising that right, such a deficiency would have been cured by the thorough plea colloquy conducted by Magistrate Judge Carlson.  (Doc. No. 87); see Mayhew, 995 F.3d at 179-80; Shedrick, 493 F.3d at 299; Molina-Marrero, 320 F.3d at 68.

### 5.     Plea Counsel Led Petitioner to Believe He Would Have to Proceed at Trial Pro Se

Petitioner claims that he did not understand his Sixth Amendment right to counsel. (Doc. Nos. 150 at 15, 173 at 18.)  In particular, he claims that "[Plea Counsel] did not tell him that he could have counsel appointed to represent him and, not being a U.S. citizen, [Petitioner] was unaware of this right and so he assumed that if he did not plead guilty, he would have to represent himself at trial."[5]  (Doc. No. 150 at 15.)  At the evidentiary hearing, Plea Counsel testified that she did not tell Petitioner that he would be unrepresented if he chose to go to trial and that they did not discuss going to trial.  (Doc. No. 173 at 82.)

Petitioner also asserts that, during his plea colloquy, the court did not inform him of his right to be represented by counsel during all stages of the criminal proceeding, as required by Rule 11(b)(1)(D) of the Federal Rules of Criminal Procedure.  (Doc. No. 150 at 15.)  In response,

---

[5] Petitioner also claims that that Plea Counsel told him explicitly that she would not represent him at trial.  (Doc. No. 150 at 15.)  At the evidentiary hearing Petitioner testified:  "[Plea Counsel] was saying basically, like, I didn't pay her to go to trial, that I only paid her to get a plea, a good plea for me, I should remember in Canada that she told me these things, that is the only thing she has to do, that she can't go to trial because the government wins all their cases when you go to trial."  (Doc. No. 173 at 18.)

the Government contends that at the plea hearing there was "no reason to discuss whether

[Petitioner] would have to proceed pro se if he was successful in withdrawing his plea." (Doc.

No. 165 at 15.)  The Government also contends that "there is no indication that there was a valid

basis to withdraw [Petitioner's plea] and no indication that it would have been successful." (Id.)

 The Court does not credit Petitioner's testimony that he did not understand his Sixth

Amendment right to counsel.  Petitioner has prior experience with the American criminal justice

system, as he was convicted for his participation in a similar criminal enterprise several decades

ago. (Doc. No. 75 ¶¶ 60-67.)  Petitioner's actions following the entry of judgment against him

indicate that he has an in-depth understanding of the criminal justice system, including the

availability of court-appointed counsel.  For instance, Petitioner clearly understood his right to

representation when he filed an appeal with the Third Circuit Court of Appeals and requested

that the court of appeals appoint an attorney.  See Obi, No. 18-3426 at ECF Doc. No.

003113329037.  In fact, Petitioner has a history of vigorously cycling through court-appointed

attorneys in relation to the many post-conviction motions he has filed with this Court, indicating

that he likely understood at the time of his guilty plea that court-appointed counsel was available

to him. (Doc. Nos. 97, 102, 103, 110, 113, 122, 126, 139, 143.)  Although Petitioner could have

gained this thorough understanding of the availability of counsel after the entry of judgment in

the instant case, Petitioner has given the Court no reason to so find.

 As for the omission of Petitioner's right to counsel from the plea colloquy, it does not

impact the Court's finding that there was no constitutionally ineffective assistance on this

ground.  Failure to inform an already-represented defendant of his right to counsel during a plea

hearing usually does not affect the "knowing and voluntary" nature of a guilty plea, as

knowledge of the right can be inferred from the fact that the defendant is represented.  See

United States v. Lovett, 844 F.2d 487, 491-92 (7th Cir. 1988) (finding that the district court's failure to inform a represented criminal defendant of his right to court-appointed counsel during the plea colloquy was harmless, especially given the petitioner's "extensive experience as a criminal defendant"); United States v. Gomez-Cuevas, 917 F.2d 1521, 1525-26 (10th Cir. 1990) (finding that no prejudice resulted from a plea colloquy where the court failed to inform the already-represented defendant of his right to counsel); United States v. Caston, 615 F.2d 1111, 1116 n.4 (5th Cir. 1980) (finding the defendant's guilty plea "voluntary and intelligent" despite the court's failure to address the right to counsel at trial).  Additionally, at the plea hearing, Petitioner testified that he was satisfied with the representation he had received from Plea Counsel, giving the Court no reason to think that Petitioner would seek new, court-appointed counsel in the future.  (Doc. No. 87 at 5.)

Because the Court does not credit Petitioner's testimony that he was without knowledge of his right to appointed counsel or that Plea Counsel told him he would have to proceed to trial pro se, the Court finds no constitutionally ineffective assistance on this ground.

> ### 6.    Plea Counsel Failed to Discuss with Petitioner the Withdrawal of his Guilty Plea after Receiving the Presentence Investigation Report and Failed to Explain Why She Withdrew the Objection to the Loss Amount

Petitioner's entire argument on this ground focuses on the loss amount listed in the PSR, which was apparently higher than he expected based on Plea Counsel's initial advice.  (Doc. No. 150 at 17-18.)  According to Petitioner, Plea Counsel never told him he could be liable for the entire loss amount underlying the indictment if he pleaded guilty only to one count.  (Doc. No. 173 at 12, 22, 24-25.)  Petitioner claims that, had he known he was able to withdraw his guilty plea after the issuance of the PSR, he would have done so based on the unexpectedly high loss amount and its likely impact on his overall sentence.  (Id.)  As discussed, supra, Plea Counsel

testified that she expressed to Petitioner that she was hopeful the Court would consider the overall loss amount near $250,000, but that the loss amount would be calculated based on overall losses of Petitioner's victims and was at the Court's discretion.  (Doc. No. 173 at 72-75.)  She also testified that she planned on negotiating the loss amount with the Government.  (Id. at 83-86, 100-101.)

In the Plea Agreement, which was signed prior to the issuance of the PSR, Petitioner agreed that "if the court imposes a sentence with which the defendant is dissatisfied, the defendant will not be permitted to withdraw any guilty plea for that reason alone."  (Doc. No. 40 § I ¶ 23.)  Withdrawing his guilty plea out of surprise at the underlying loss amount would have been in direct violation of Petitioner's Plea Agreement.  (Id.)  Petitioner also indicated to Magistrate Judge Carlson that he understood that he would be bound by his guilty plea, even if the sentencing guidelines turned out to be "different or higher" than he expected.  (Doc. No. 87 at 13.)  Given that any attempt to withdraw the Plea Agreement based on the underlying loss amount would have been without merit, Plea Counsel was not bound to discuss that possibility with Petitioner.  See Sanders, 165 F.3d at 253.  Therefore, the Court finds that Plea Counsel's actions as to this ground were not constitutionally ineffective.

Petitioner also claims that Plea Counsel was ineffective for failing to explain why she withdrew the objection originally lodged against the loss amount in the PSR.  (Doc. No. 150 at 19.)  However, he provides no legal support for the proposition that such a failure amounts to constitutionally ineffective assistance of counsel.  (Id.)  To the extent that Petitioner argues that Plea Counsel's withdrawal of the objection was in and of itself unreasonable, the Court does not agree.  Although the Third Circuit Court of Appeals has ruled that failure to "object to an improper enhancement under the Sentencing Guidelines" amounts to ineffective assistance of

21

counsel, the Court finds no such ineffective assistance in this case.  See United States v. Otero,
502 F.3d 331, 336 (3d Cir. 2007) (quoting Jansen v. United States, 369 F.3d 237, 244 (3d Cir.
2004)).  Indeed, the Court is required to afford counsel "wide latitude…in making tactical
decisions."  See Strickland, 466 U.S. at 689.  The offense level as calculated in the PSR was
thirty-two (32), which included an 18-level increase based on an overall loss amount of
$4,482,927 and the three-level reduction for acceptance of responsibility agreed to in the Plea
Agreement.  (Doc. No. 75 ¶¶ 48-59.)  Plea Counsel objected on Petitioner's behalf to the loss
amount (Doc. Nos. 75 ¶ 17, 76 at 1), and argued instead for a loss amount commensurate with a
14-level increase.  (Doc. No. 76 at 1.)  She later withdrew that objection, stipulating with the
Government that: (1) the overall loss amount was $4.4 million; (2) a two-level enhancement for
leadership did not apply to Petitioner; and (3) check-cashers, like Petitioner, would likely have
received only three to five percent of the overall proceeds from such a fraudulent scheme.  (Doc.
No. 80 at 3.)  Petitioner's sentencing memorandum maintained that the loss amount as applied to
Petitioner's sentence should be in line with his portion of the proceeds, which was estimated to
be five to ten percent of the overall losses.  (Id. at 4.)  Petitioner's overall offense level score as
calculated in the PSR was thirty-two (32), which, along with Petitioner's Criminal History
Category of III, would have qualified him for a term of imprisonment ranging from 151-188
months under the federal sentencing guidelines in place at the time.  See (Doc. No. 75 ¶ 17);
U.S.S.G. § 5A (2018).  However, Plea Counsel's stipulation with the Government that the
leadership enhancement did not apply removed two (2) offense levels from Petitioner's overall
score, leading the Court to sentence Petitioner to 144 months' imprisonment.  (Doc. No. 83 at 1.)

    Given the circumstances of Petitioner's guilty plea and sentence, the Court cannot say
that Plea Counsel acted in a professionally unreasonable fashion by failing to object to the loss

amount at sentencing.  See Strickland, 466 U.S. at 691.  As Plea Counsel testified, Petitioner's objection to the loss amount may well have caused the Court not to apply a downward deviation for acceptance of responsibility or to have applied a leadership enhancement.[6]  (Doc. No. 173 at 94.)  Without the benefit of sentence-level reductions for acceptance of responsibility and the removal of the suggested leadership enhancement, Petitioner would likely have had to show that the loss amount was millions of dollars less than claimed by the Government in order to have received a more favorable sentencing outcome than that which resulted from the stipulations.[7] See U.S.S.G. § 2B1.1(b)(1) (2018).  If Plea Counsel had failed to successfully contest the loss amount, Petitioner may have ended up with a higher sentence than the one he received.  (Id.) Likewise, if Petitioner had chosen to go to trial and was convicted on all counts, his guideline range would have been 168-210 months' imprisonment.  (Doc. No. 75 ¶ 85.)  In addition, Petitioner has provided the Court with no evidence, other than his purported innocence of all charges against him, as to why the loss amount calculated by the Government was inaccurate, much less inaccurate to the tune of several million dollars.

---

[6] Plea Counsel testified as follows at the evidentiary hearing about her decision not to aggressively contest the loss amount asserted by the Government:  "I think I would have been concerned about if we were going to start rocking into acceptance of responsibility and whether he would get credit for that and how that could go adverse. I think I probably thought that I would be conservative and make sure those two points go away and then still argue to try to mitigate the sentence in other ways."  (Doc. No. 173 at 94.)

[7] Without adjustments for acceptance of responsibility and the removal of the originally recommended leadership enhancement, Petitioner's total offense level would have been thirty-five (35).  (Doc. No. 75 ¶ 56.)  In that scenario, for Petitioner to have reduced his offense level from thirty-five (35) to thirty (30) or below based only on successfully contesting the loss amount, Petitioner would have had to show that, rather than a loss amount of almost $4.5 million, he was responsible for losses totaling less than $550,000.  See U.S.S.G. § 2B1.1(b)(1)(G) (2018).

Plea Counsel appears to have negotiated a deal for her client that resulted in a lower sentence than he likely would have received had he contested the loss amount, even if the Court adjusted the loss amount downward by millions of dollars, or if he had proceeded to trial.  Given the "wide latitude" the Court must afford to counsel's tactical decisions, as well as the presumption that counsel acted reasonably, the Court holds that Plea Counsel's withdrawal of the objection to the loss amount was not unreasonable.  See Strickland, 466 U.S. at 689; Jermyn, 266 F.3d at 282.  Therefore, the Court finds that Plea Counsel was not constitutionally ineffective on this ground.

### D.    Prejudice

Additionally, Petitioner fails to persuasively argue that he was prejudiced by Plea Counsel's alleged failures on any of the above grounds.  Strickland requires that Petitioner do more than claim Plea Counsel's actions were "professionally unreasonable."  See Strickland, 466 U.S. at 691.  He also must show that those actions had an "effect on the judgment," amounting to a less favorable outcome than he would have otherwise received.  (Id.)  Petitioner makes no such showing here.  In Petitioner's uncounseled § 2255 motion, he simply asserts that "a trial would likely have resulted in an acquittal in this case since Petitioner is actually innocent."  (Doc. No. 90 at 4.)  In Petitioner's supplemental motion, he does not reassert his actual innocence claims, but rather insists he was prejudiced because, had he been properly advised, "he would not have pled guilty and would have gone to trial and preserved his defenses, put the government to its proofs, and not forfeited his appellate rights."  (Doc. No. 150 at 4.)

However, beyond asserting that he would have gone to trial had Plea Counsel acted differently, Petitioner bears the burden of showing that proceeding to trial would have been "rational under the circumstances."  See Padilla, 559 U.S. at 371-72.  The Court finds that

Petitioner did not make this showing on any of the above grounds.  The fact remains that, while Petitioner pleaded guilty to a single count of wire fraud, he was indicted on twenty-five (25) counts on a variety of federal offenses.  (Doc. No. 1.)  Petitioner was ultimately sentenced to 144 months' imprisonment.  (Doc. No. 82 at 2.)  As the Government points out, had Petitioner been convicted at trial only on the one count of wire fraud to which he pleaded guilty, his sentencing guideline range would have still been higher than it was as a result of his plea.  (Doc. No. 176 at 8.)  Had Petitioner been convicted on all counts, he would have been subject to a guideline imprisonment range of 168-210 months.  (Doc. No. 75 ¶ 85.)  To find that Plaintiff was prejudiced would, in essence, require the Court to find Petitioner could have rationally expected that either: (1) he was likely to be acquitted of most or all of the charges against him at trial; or (2) the Government would likely be unable to substantiate the overall loss amount for the purposes of sentencing.  See Padilla, 559 U.S. at 371-72.  Petitioner has given the Court no valid basis upon which to make the conclusion that going to trial would have been a rational choice for him to make given the circumstances of his plea.  Therefore, the Court finds that Petitioner has not demonstrated prejudice on any of the grounds asserted.

### E.      Certificate of Appealability

In proceedings brought under § 2255, a petitioner cannot appeal to the circuit court unless a certificate of appealability ("COA") has been issued.  A court may not issue a COA unless "the applicant has made a substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2).  In other words, a COA should not issue unless "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Because the Court concludes that Petitioner's claims of ineffective assistance are meritless, the Court finds that reasonable jurists would not disagree

with the Court's assessment of Petitioner's claims.  Accordingly, a COA will not issue in this case.

**IV.     CONCLUSION**

For the foregoing reasons, the Court will deny Petitioner's § 2255 motion.  (Doc. Nos. 90, 150.)  An appropriate Order follows.